## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISE AGNES-SAMPSON, Individually and On Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>   v.<br><br>ARRIS INTERNATIONAL PLC, ROBERT J. STANZIONE, BRUCE MCCLELLAND, ANDREW W. BARRON, J. TIMOTHY BRYAN, JAMES A. CHIDDIX, ANDREW T. HELLER, JEONG KIM, BARTON Y. SHIGEMURA, DOREEN A. TOBEN, DEBORA J. WILSON, and DAVID A. WOODLE,<br><br>            Defendants. | Case No. _____<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by her undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is a class action brought by Plaintiff on behalf of herself and all other similarly situated public shareholders of ARRIS International plc ("ARRIS" or the "Company") against ARRIS and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants," and, together with ARRIS, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of ARRIS by CommScope Holding Company, Inc. ("CommScope") (the "Proposed Transaction").

1

2. On November 8, 2018, ARRIS and CommScope entered into an Agreement and Plan of Reorganization (the "Merger Agreement"), pursuant to which CommScope has agreed to acquire all of the issued and to be issued ordinary shares of ARRIS for $31.75 in cash per ordinary share (the "Merger Consideration").

3. On December 19, 2018, in order to convince ARRIS's public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

4. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for ARRIS; and (ii) the valuation analyses performed by ARRIS's financial advisor, Evercore Group L.L.C. ("Evercore").

5. The special meeting of ARRIS' shareholders to vote on the Proposed Transaction is **February 1, 2019** (the "Shareholder Vote"). It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so ARRIS shareholders can properly exercise their corporate suffrage rights.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to ARRIS's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act

and Rule 14a-9.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, ARRIS's common stock trades on the Nasdaq stock exchange, which is headquartered in this District, which renders venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of ARRIS common stock.

11.     Defendant ARRIS is a public limited company incorporated under the laws of England and Wales. ARRIS's common stock is traded on the NasdaqGS under the ticker symbol "ARRS."

12.     Defendant Robert J. Stanzione is, and has been at all relevant times, a director of the Company, and currently serves as Chairman of the Board.

13. Defendant Bruce McClelland is, and has been at all relevant times, a director of the Company, and currently serves as Chief Executive Officer of ARRIS.

14. Defendant Andrew M. Barron is, and has been at all relevant times, a director of the Company.

15. Defendant J. Timothy Bryan is, and has been at all relevant times, a director of the Company.

16. Defendant James A. Chiddix is, and has been at all relevant times, a director of the Company.

17. Defendant Andrew T. Heller is, and has been at all relevant times, a director of the Company.

18. Defendant Dr. Jeong Kim is, and has been at all relevant times, a director of the Company.

19. Defendant Barton Y. Shigemura is, and has been at all relevant times, a director of the Company.

20. Defendant Doreen A. Toben is, and has been at all relevant times, a director of the Company.

21. Defendant Debora J. Wilson is, and has been at all relevant times, a director of the Company.

22. Defendant David A. Woodle is, and has been at all relevant times, a director of the Company.

23. The defendants identified in paragraphs 12 through 22 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with ARRIS, the "Defendants."

## CLASS ACTION ALLEGATIONS

24. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of herself

and the other public shareholders of ARRIS (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

25. This action is properly maintainable as a class action because:

(a) the Class is so numerous that joinder of all members is impracticable. As of November 8, 2018, there were approximately 173,858,030 shares of ARRIS common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of ARRIS will be ascertained through discovery;

(b) there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

(i) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy, in violation of Section 14(a) of the Exchange Act;

(ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(iii) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

(c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; an

(g) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

26. ARRIS, together with its subsidiaries, provides entertainment, communications, and networking technology and solutions worldwide. It operates through three segments: Customer Premises Equipment, Network & Cloud, and Enterprise Networks. The Customer Premises Equipment segment offers digital subscriber lines and cable modems, broadband gateways, set-top boxes, and video gateways. The Network & Cloud segment provides cable modem termination system, converged cable access platform, passive optical network, service provider and programmer equipment, Ad insertion technologies, and equipment in the ground or on transmission poles, as well as equipment used to initiate the distribution of content-carrying signals. This segment also offers technical support and professional services; software products that enable providers to deliver content and advertising services; network management products that collect information from the broadband network; and customer experience management solutions, as well as network surveillance

and issue correlation software and services. The Enterprise Networks segment provides wired Ethernet switches; and indoor, outdoor, and special-purpose Wi-Fi access points, as well as accessories, such as antennas. This segment also offers SmartCell Insight, a big data Wi-Fi analytics and reporting platform; ZonePlanner, a Wi-Fi planning and modeling software; Smart Positioning Technology, a cloud-based smart Wi-Fi location-based services platform; Cloudpath Wi-Fi device; mobile apps for controllers, cloud Wi-Fi, location, and performance testing; Ruckus Cloud Wi-Fi, a wireless local area network management-as-a-service; and ZoneDirector, a smart Wi-Fi controller. The company was formerly known as ARRIS Group, Inc. and changed its name to ARRIS International plc in January 2016. ARRIS International plc was founded in 1969 and is headquartered in Suwanee, Georgia.

27. On November 8, 2018, the Board caused the Company to enter into the Merger Agreement with CommScope.

28. Pursuant to the terms of the Merger Agreement, ARRIS's shareholders will receive $31.75 in cash for each share of ARRIS common stock they hold.

29. According to the press release announcing the Proposed Transaction:

> CommScope (NASDAQ: COMM), a global leader in infrastructure solutions for communications networks, has agreed to acquire ARRIS International plc (NASDAQ: ARRS), a global leader in entertainment and communications solutions, in an all-cash transaction for $31.75 per share, or a total purchase price of approximately $7.4billion, including the repayment of debt.
>
> In addition, The Carlyle Group, a global alternative asset manager, has reestablished an ownership position in CommScope through a $1 billion minority equity investment as part of CommScope's financing of the transaction.
>
> The combination of CommScope and ARRIS, on a pro forma basis, would create a company with approximately $11.3 billion in revenue and adjusted EBITDA (earnings before interest, taxes, depreciation and amortization) of approximately
> $1.8 billion, based on results for the two companies for the 12 months ended September 30, 2018.

The combined company is expected to drive profitable growth in new markets, shape the future of wired and wireless communications, and position the new company to benefit from key industry trends, including network convergence, fiber and mobility everywhere, 5G, Internet of Things and rapidly changing network and technology architectures.

ARRIS, an innovator in broadband, video and wireless technology, combines hardware, software and services to enable advanced video experiences and constant connectivity across a variety of environments – for service providers, commercial verticals, small enterprises and the people they serve. ARRIS has strong leadership positions in the three segments in which it operates:

• Customer Premises Equipment (CPE), featuring access devices such as broadband modems, gateways and routers and video set-tops and gateways;

• Network & Cloud (N&C), combining broadband and video infrastructure with cloud-based software solutions; and

• Enterprise Networks, incorporating the recently acquired Ruckus Wireless® and ICX Switch® businesses, and focusing on wireless and wired connectivity, including Citizens Broadband Radio Service solutions.

For the 12 months ended September 30, 2018, ARRIS generated revenues of approximately $6.7 billion, consisting of $3.9 billion from CPE, $2.2 billion from N&C and $568 million from Enterprise Networks (reflecting only a partial year of Ruckus since its acquisition in December 2017). . . .

Terms and Financing

The per share cash consideration represents a premium of approximately 27 percent to the volume weighted average closing price of ARRIS' common stock for the 30 trading days ended October 23, 2018, the day prior to market rumors regarding a potential transaction.

The transaction is not subject to a financing condition. CommScope expects to finance the transaction through a combination of cash on hand, borrowings under existing credit facilities and approximately $6.3 billion of incremental debt for which it has received debt financing commitments from J.P. Morgan Securities LLC, BofA Merrill Lynch and Deutsche Bank Securities Inc.

In addition, The Carlyle Group, a former CommScope owner, is reestablishing a minority ownership position in the company through a $1 billion equity investment, equal to approximately 16 percent of

8

>CommScope's outstanding shares. . . .
>
>Leadership and Headquarters
>
>Following completion of the combination, Eddie Edwards will continue in his role as president and chief executive officer of CommScope, with Bruce McClelland and other members of the ARRIS leadership team joining the combined company.

**The Proxy Omits Material Information**

30. On December 19, 2018, the Defendants filed a materially incomplete and misleading Proxy with the SEC and disseminated it to ARRIS' shareholders. The Proxy sets a shareholder vote on February 1, 2018 and solicits the Company's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

31. First, the Proxy fails to provide enough information regarding financial projections for the Company. In particular, the Proxy fails to disclose: (i) ARRIS's projected unlevered free cash flows and its underlying line items; (ii) all line items used to calculate ARRIS's non-GAAP EBITDA; (iii) a reconciliation of all non-GAAP to GAAP metrics; and (iv) ARRIS's projections for the years 2022 and 2023. *See* Proxy at 45-46.

32. Indeed, Evercore's *Illustrative Leveraged Buyout Analysis* was based on projections for the Company's expected financial performance during the years 2022 and 2023. *See* Proxy at 44. However, the Proxy fails to disclose *any* financial projections for years 2022 and 2023.

33. Indeed, investors are concerned, perhaps above all else, with the projections and cash flows of the companies in which they invest. Under sound corporate finance theory, the market value of a company should be premised on the expected cash flows of the corporation. Accordingly,

the question that the Company's shareholders need to assess in determining whether to vote in favor of the Proposed Transaction is clear – is the Merger Consideration fair compensation given ARRIS's projected cash flows? Without ARRIS's cash flow projections for the years 2017 to 2021, the Company's shareholders will not be able to answer this question and assess the fairness of the Merger Consideration.

34. Defendants elected to summarize the projections for ARRIS on pages 45 and 46 of the Proxy, but they excised and failed to disclose the most important projections—ARRIS's unlevered free cash flows (the "Cash Flow Projections"). The omission of the Free Cash Flow Projections renders the projection tables on pages 45-46 of the Proxy incomplete and misleading because, without the Cash Flow Projections, the projection summaries provide a misleading overall valuation picture of ARRIS. This is because there are significant differences between unlevered free cash flow projections—widely recognized as the most important valuation metric when it comes to valuing a company and its stock—and the projections that were included in the Proxy: EBITDA.

35. The disclosed primary projection metrics (EBITDA) *are not sufficient analogs for cash flow projections*. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, EBITDA.

36. Indeed, there are fundamental differences between unlevered free cash flow and EBITDA. EBITDA is not a sufficient alternative to unlevered free cash flows – as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization. That makes sense, only if you think capital expenditures are funded by the tooth fairy."[1] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does

---

[1] Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[2] As a result of these material differences between EBITDA and unlevered free cash flows, experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

37. In light of these significant differences between free cash flow on the one hand, and the projected metrics that Defendants elected to disclose in the Proxy—namely, EBITDA—the tables of projections on pages 45 through 46 of the Proxy were materially incomplete and misleading because, by failing to include the Cash Flow Projections, the tables provide a materially incomplete and misleading overall valuation picture of ARRIS. Simply put, unlevered free cash flow projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

38. The omission of the Cash Flow Projections renders the financial projections included in the Proxy misleading. If a Proxy discloses financial projections and valuation information, such projections must be **complete and accurate**. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—**but it may not choose half-truths**. Accordingly, Defendants have disclosed some of the projections relied upon by Evercore, but have omitted the Cash Flow Projections. Thus, their omission renders the projections disclosed on pages 45-46 misleading.

39. With respect to Evercore's discounted cash flow ("DCF") analysis , the Proxy fails to disclose: (i) the inputs and assumptions underlying the selection of the range of discount rates from 10.0% to 11.0% (*i.e.*, the components ARRIS's weighted average cost of capital); (ii) the inputs

---

[2]   Cody Boyte, *Why EBITDA is Not Cash Flow*, Axial Forum (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

11

and assumptions underlying the selection of the perpetuity growth rates of negative 0.5% to positive 1.5%; and (iii) ARRIS's estimated net debt and noncontrolling interests. *See* Proxy at 41.

40.     These key inputs are material to ARRIS shareholders, and their omission renders the summary of Evercore's *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow ("DCF") analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, ARRIS's shareholders cannot evaluate for themselves the reliability of Evercore's *Discounted Cash Flow Analysis*, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or was the result of Evercore's unreasonable judgment, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

41.     Similarly, the Proxy does not disclose the transactions and premiums observed by Evercore in its *Premiums Paid Analysis*. *See* Proxy at 44. The omission of this information renders

the summary of the analysis and the multiples and implied equity reference ranges calculated for ARRIS misleading. A fair summary of Evercore's *Premiums Paid Analysis* requires the disclosure of the identities of the transactions that were utilized in the analysis and the individual premiums associated with each transaction; merely stating that Evercore applied a reference range of premiums of 20% to 50% to ARRIS's share price as of October 23, 2018 is insufficient, as ARRIS's shareholders unable to assess whether the banker considered the appropriate transactions, or, instead, only considered premiums from certain transactions in order to drive down the Company's value.

42. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 )**

43. Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

44. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

45. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

46. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

47. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for ARRIS; and (ii) the valuation analyses performed by Evercore in support of its fairness opinion.

48. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

49. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Evercore reviewed and discussed its financial

analyses with the Board, and further states that the Board considered the financial analyses provided by Evercore, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review Evercore's analyses in connection with their receipt of the fairness opinions, question Evercore as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

50. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

51. ARRIS is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

52. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff and the Class have no adequate

remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

53.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

54.     The Individual Defendants acted as controlling persons of ARRIS within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of ARRIS, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

55.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

57. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

58. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

60. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C. Directing the Defendants to account to Plaintiff and the Class for all damages sustained

as a result of their wrongdoing;

       D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

       E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 26, 2018

**Monteverde & Associates PC**

By: */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*